KENNETH MASON,

   Plaintiff,

v.            Civil Action No. 2:10cv55
              (Judge Bailey)

WEXFORD HEALTH SOURCES,

and

ADRIAN HOKE, Warden,

   Defendants.

## REPORT AND RECOMMENDATION

### I. Procedural History

   The plaintiff, then *pro se*[1], initiated this civil rights action pursuant to 42 U.S.C. § 1983 on April 28, 2010. In the complaint, the plaintiff asserted that defendants Wexford Health Sources ("Wexford"), Warden Adrian Hoke ("Hoke"), and Tristan Tenney[2] ("Tenney") were deliberately indifferent to his serious medical needs and were medically negligent. On May 11, 2010, an Order was entered granting the plaintiff leave to proceed *in forma pauperis*. On May 18, 2010, the plaintiff paid his required initial partial filing fee. On June 1, 2010, the plaintiff filed an amended complaint, raising new claims against the named defendants, and adding claims against eight new defendants, Jane Doe nurses 1-8.

   On June 2, 2010, the undersigned conducted a preliminary review of the complaint and determined that summary dismissal was not appropriate. Accordingly, an Order to Answer was

---

[1] Plaintiff is now represented by appointed counsel.

[2] Defendant Tenney has since been dismissed from this action.

entered, and Summonses were issued for the defendants. In addition, the plaintiff was afforded 120 days to provide the Court with the names of the eight Jane Does.

On June 24, 2010, Hoke filed a Motion to Dismiss with a Memorandum in support thereof. On July 1, 2010, Tenney filed a Motion to Dismiss with a Memorandum in support thereof. Because the plaintiff was then proceeding without counsel, the Court issued <u>Roseboro</u> Notices on June 30, 2010 and July 2, 2010, advising the plaintiff of his right to file a response to the defendants' motions. On August 2, 2010, the plaintiff filed a response, and on August 11, 2010, the defendants filed replies. On September 20, 2010, Wexford filed a Motion to Dismiss with a supporting memorandum. A <u>Roseboro</u> Notice was issued on September 22, 2010, the plaintiff filed a response on September 27, 2010, and the defendant filed a reply on October 6, 2010.

On October 21, 2010, the undersigned issued a Report and Recommendation ("R&R") that: the plaintiff's claims against Hoke be dismissed for failure to state a claim upon which relief could be granted; his claims against Tenney be dismissed for failure to meet the requirements of W.Va. Code §55-7B-6; his claims against Wexford be dismissed because Wexford was not a "person" for purposes of 42 U.S.C. § 1983; and his claims against the eight Jane Doe nurses be dismissed, because although plaintiff had been given sufficient time in which to identify them, he had failed to do so. The undersigned also recommended that the defendants' motions to dismiss be granted and that plaintiff's complaint and amended complaint be dismissed with prejudice for failure to state a claim upon which relief could be granted.

On October 26, 2010, plaintiff filed a motion for an extension of time to identify the eight Jane Doe defendant nurses. On November 5, 2010, he filed a motion for referral back to the magistrate judge for a R&R based on the entire record, along with objections to the R&R. The

defendants Tenney and Wexford filed a November 18, 2010 response in opposition to plaintiff's motion for referral back to the magistrate judge.

After consideration of plaintiff's objections, by Order entered on January 11, 2011, the Court adopted in part the undersigned's Report, overruling plaintiff's objections; dismissing the claims against defendants Tenney with prejudice; granting defendant Tenney's motion to dismiss; denying defendants Hoke and Wexford's Motions to Dismiss; denying plaintiff's motion for an extension of time in which to identify Jane Doe nurses 1-8 and dismissing them from the action; and remanding the case back to the undersigned for further proceedings. Thereafter, defendants Hoke and Wexford each filed an Answer to the complaint, and on February 3, 2011, the undersigned issued a First Order and Notice Regarding Discovery and Scheduling.

Discovery commenced on February 23, 2011. On June 6, 2011, plaintiff filed a motion for appointment of counsel. Despite responses in opposition filed by both defendants, by Order entered on June 22, 2011, counsel was appointed to represent plaintiff. On June 30, 2011, defendant Wexford filed a motion for summary judgment with a memorandum in support, and on July 5, 2011, defendant Hoke did the same. Plaintiff, by counsel, requested an extension of time in which to respond, which was granted by Order entered July 18, 2011. Plaintiff filed his response on September 16, 2011. On September 29, 2011, defendant Wexford filed its reply, and on October 4, 2011, defendant Hoke filed his. This case is therefore before the undersigned for a Report and Recommendation on the Motions for Summary Judgment filed by defendants Hoke and Wexford.

## II.    Contentions of the Parties

### A.    The Complaint

In his complaint, the plaintiff asserts that since 2006, he has suffered repeated infections from Methicillin-Resistant Staphylococcus Aureus ("MRSA") which defendants Tenney and Wexford inadequately treated with Doxycline[3] [sic] and Rifanpin[4] [sic] instead of Vancomycin, treatment he alleges was below the degree of care.  He further alleges he was denied proper sanitary measures to aid in ridding himself of or avoiding recurrences of infection. He maintains that defendants' delay in providing him proper medical treatment has left him with permanent injuries to his muscles, nerves, veins and flesh, from which he still suffers pain.

In his amended complaint, the plaintiff added claims against the now-dismissed defendants Jane Doe Nurses 1-8. Because those defendants have been dismissed, those claims will not be addressed.  Further, he claimed that he had not "been seen by a doctor covering staph." (Dkt.# 14 at 2).  He also alleges that there have been "hundreds" of cases of staph infection at HCC in the past six years; that presently there are about 30 cases; and that MRSA-infected prisoners are not kept isolated from the other prisoners, in violation of policy issued by the Division of Corrections.

As relief, the plaintiff indicates in his original complaint that he seeks declaratory relief, injunctive relief, compensatory damages, and punitive damages.

### B.    Warden Hoke's Motion for Summary Judgment

In his Motion for Summary Judgment, Warden Hoke asserts that discovery has proven that the policies and procedures at Huttonsville Correctional Center ("HCC") have effectively eliminated a substantial risk of MRSA infection, because the facility has achieved and

---

[3] The correct spelling of the antibiotic is Doxycycline.

[4] The correct spelling of the antibiotic is Rifampin.

maintained an inmate MRSA rate of less than 1% over the past several years, well below that of many other correctional facilities. Further, Hoke denies that the laundry procedures used at HCC contribute to a risk of MRSA infection or re-infection. Hoke avers that the HCC is cleaned daily using a germicidal detergent effective at eliminating MRSA bacteria, its cleanliness and sanitation are checked weekly and monthly by trained inspectors, and any safety or health issues found are immediately remedied.

Hoke contends that the plaintiff's claim that he should have been medically isolated in a single cell has no merit, arguing that plaintiff has no constitutional right to a single cell, nor is isolation routinely indicated for MRSA infection. Hoke argues that the Warden is entitled to rely on the opinion of his medical staff; if isolation had been ordered by the prison doctor, Hoke would have immediately transferred plaintiff to another facility where isolation was available, or to a local hospital. Hoke again asserts the defense of qualified immunity. Finally, Hoke contends that neither of plaintiff's claims regarding HCC's allegedly inadequate laundry procedures and his claim that he should have been kept isolated from other inmates have been administratively exhausted and therefore, both should be dismissed.

## C.  Wexford Health Source's Motion for Summary Judgment

In support of its motion for summary judgment, Wexford asserts that it assumed the contract to provide medical services at HCC on May 1, 2008; since that time, the plaintiff has been treated five times between June 15, 2008 and September 5, 2010 for recurrent skin infections. All infections were treated with antibiotics and healed without sequelae. At no time did plaintiff ever have a draining lesion that could not be covered with a dressing or Band-Aid. Plaintiff was identified as a probable nasal carrier of MRSA as a result of a nasal culture done on October 5, 2009. Because he was an established staph carrier, multiple cultures were not

performed when he developed subsequent infections. As for plaintiff's request for decolonization, decolonization of staph carriers nationally has not been proven to be effective or practical.

Wexford avers that MRSA is widespread in the U.S. and is considered endemic in facilities where groups of people live together. Thirty per cent of the American population are carriers of non-resistant staph, and one per cent are carriers of the resistant strain. HCC has an inmate population of 1135 and would be statistically expected to have about 340 staph carriers and 11 MRSA carriers.

Wexford contends that plaintiff never required isolation because he had no draining lesions that could not be covered with a dressing or Band Aid. Wexford follows two MRSA policy statements and the BOP has also adopted Clinical Practice Guidelines regarding MRSA management. None of these policies or guidelines require single-celling of an inmate with MRSA when that inmate has MRSA without drainage or drainage containable by a simple dressing. Wexford's Infection Control Manual, medical policies and procedure dictate how inmate laundry is to be done; there is no special mandate for washing the laundry of MRSA-infected inmates. Separate laundering is not required and the laundry at HCC is processed according to all applicable guidelines. Moreover, Wexford points out, plaintiff admits that no doctor or other medical staff advised him that his recurrent MRSA infections were a result of laundry practices, and plaintiff has admitted in discovery that no doctor told him that the infections were caused by not being placed in isolation.

Whether an entity is a "person" subject to liability under 42 U.S.C.§ 1983 depends on a) whether the entity has official policies and customs, and b) whether the customs or policies have caused an alleged deprivation of federal rights. Defendant Wexford argues that it does have

policies, but its policies have not caused any deprivation of plaintiff's Eighth Amendment rights, thus Wexford cannot be a "person" for the purposes of 42 U.S.C. § 1983. Further, Wexford argues, neither Dr. Proctor or Wexford have been deliberately indifferent to plaintiff's serious medical needs. Plaintiff was always prescribed the appropriate medications to treat his infections; a simple disagreement as to the proper course of medical treatment does not support a claim for deliberate indifference.

Finally, Wexford asserts that the complaint, as it relates to it, must fail because there is no genuine issue as to any material fact that plaintiff received inappropriate treatment or that Wexford's policies caused any deprivation of his Eighth Amendment rights. Accordingly, Wexford argues that it is entitled to judgment in its favor as a matter of law.

**D.  Plaintiff's Response to Defendant Hoke's Motion for Summary Judgment**

Plaintiff asserts that he has exhausted his administrative remedies and that defendants' claim to the contrary is based on plaintiff's discovery answers, which were a result of a good faith misunderstanding of defendants' requests for admission.

Plaintiff contends that Hoke's failure to address HCC's staph epidemic and to treat plaintiff's MRSA infection is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

Plaintiff reiterates his claim that defendant Hoke is not entitled to qualified immunity because his improper treatment of plaintiff's recurrent MRSA infection violated plaintiff's Eighth Amendment rights and a reasonable person in Hoke's position would have known that their actions were in violation of the Eighth Amendment.

Hoke's motion for summary judgment should be denied because there are genuine issues of material fact and therefore, Hoke is not entitled to judgment as a matter of law.

### E. **Plaintiff's Response to Defendant Wexford's Motion for Summary Judgment**

Plaintiff avers that defendant Wexford's failure to address HCC's staph epidemic and treat plaintiff's MRSA infection is based on Wexford's policy or custom, and therefore, Wexford is liable as a private person under § 1983 for its violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Plaintiff reiterates his contention that Wexford is deliberately indifferent to the pain and suffering its inadequate treatment of plaintiff's MRSA infection has caused and asserts that the treatment Wexford provided plaintiff contravened its own medical policies and procedures.

### F. **Defendant Hoke's Reply to Plaintiff's Response**

Defendant Hoke avers that plaintiff's allegations regarding the defendant violating its own procedures have been completely disproven. There is no policy at the prison prohibiting isolation; the defendant has established that it does isolate inmates with MRSA; that an isolation unit is available for medically necessary isolation; and that prison physicians can send inmates to that facility without interference. Plaintiff admits that he himself was isolated for MRSA at HCC in the past; his only remaining dispute is that he was not isolated not long enough. A dispute with medical providers' health care decisions is insufficient to state a § 1983 claim.

Nor is there any policy at the prison to deny clean bedding. Plaintiff's allegations regarding laundering of MRSA-infected inmate's clothing, bedding and towels as violative of defendant's own policies and procedures is baseless. Defendant has shown that its policies, procedures and customs meet or exceed all industry guidelines regarding MRSA management.

Plaintiff has not exhausted his administrative remedies regarding the denial of isolation and the grievance over his dispute as to the proper laundry facilities and admits as much. The

only grievance for which plaintiff has exhausted his administrative remedies is for an incident where he contends he went to the medical unit and was refused medical attention.

Defendant's motion for summary judgment should be granted.

## G.  Defendant Wexford's Reply to Plaintiff's Response

Wexford argues that plaintiff's response to the motion for summary judgment merely restates his original allegations, misstates the facts, and draws incorrect inferences. Wexford contends that plaintiff has provided no evidence that he has been repeatedly re-infected with MRSA as a result of any policy or custom of the defendants; in fact, plaintiff admits that no medical provider has ever told him that his recurrent infections are a result of exposure to other inmates, faulty laundry techniques, or violation of any other policy or custom of defendant Wexford.   The facts developed in discovery disprove plaintiff's claims.   Plaintiff's unsubstantiated allegations that the defendants deliberately misstate the number of inmates infected with MRSA because of financial concerns are as baseless as his other claims.

Wexford again contends that it is not a "person" subject to liability under 42 U.S.C. § 1983.  It has not been deliberately indifferent to plaintiff's serious medical needs; to the contrary, it has demonstrated that its policies and procedures are sufficient to control MRSA infections at HCC and plaintiff has received timely and appropriate medical care.  Moreover, there is no outbreak of MRSA at HCC; the facility routinely passes all inspections and statistics show that it has a rate of MRSA infection less than the general population.

There is no genuine issue of material fact and Wexford is entitled to judgment in its favor as a matter of law.

## III.  Standard of Review

### A.  Summary Judgment

Pursuant to Rule 56© of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.  Anderson v.Lliberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  Celotex, 477 U.S. at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  Id.  This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 256.  The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment.  Id. at 248.  To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]."  Id.

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, 477 U.S. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587 (citation omitted).

## IV.  Analysis

### A.  Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," and is required even when the relief sought is not available. Id. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. See Porter v. Nussle, 534 U.S. 516, 524 (2002) (citing Booth, 532 U.S. at 741) (emphasis added). Moreover, an inmate may procedurally default his claims by failing to follow the proper procedures. See Woodford v. Ngo, 548 U.S. 81 (2006) (recognizing the PLRA provisions contain a procedural default component).

Moreover, in Woodford, the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons"; (2) to "afford corrections officials time and

opportunity to address complaints internally before allowing the initiation of a federal case;" and (3) to "reduce the quantity and improve the quality of prisoner suits." Therefore, "the PLRA exhaustion requirement requires *proper* exhaustion." Woodford, 548 U.S. at 93 (emphasis added). Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system. Id. at 103.

In Jones v. Bock, 549 U.S. 199 (2007), the United States Supreme Court ruled, among other things, that an inmate's failure to exhaust under the PLRA is an affirmative defense, and an inmate is not required to specifically plead or demonstrate exhaustion in his complaint. However, that decision does not abrogate the fact that an action under 42 U.S.C. § 1983 is subject to exhaustion of administrative remedies as required by the PLRA. Nor does it abrogate well-established Fourth Circuit precedent which allows the Court to summarily dismiss a complaint in which the failure to exhaust is clearly evident. Anderson v. XYZ Correctional Health Services, 407 F.3d 674 (4th Cir. 2005).

The WVDOC has established a three-level grievance process for prisoners to grieve their complaints in an attempt to resolve the prisoners' issues. The first level involves filing a G-1 Grievance Form with the Unit Supervisor. If the inmate receives no response or is unsatisfied with the response received at Level One, the inmate may proceed to Level Two by filing a G-2 Grievance Form with the warden/administrator. Finally, the inmate may appeal the Level 2 decision to the Commissioner of the Division of Corrections.

Here, although the plaintiff properly exhausted his claim that HCC was not providing proper medical care for his recurrent MRSA infection, the plaintiff's discovery answers concede that he did not exhaust, let alone even initiate grievances regarding the allegedly inadequate

laundry procedures at HCC or his request that he be placed in isolation for his MRSA.[5]  In his responses to the defendants' motions for summary judgment, the plaintiff argues that he misunderstood the defendants' requests for admission on the point.

Despite the fact that the Supreme Court has stated that it "will not read futility or other exceptions into statutory exhaustion requirements  . . . ," see Booth, 532 U.S. at 741 n.6, several courts have found that the mandatory exhaustion requirement may be excused in certain limited circumstances.  See Ziemba v. Wezner, 366 F.3d 161 (2d Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense, where the defendant's actions render the grievance procedure unavailable); Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) (summary dismissal for failure to exhaust not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); Aceves v. Swanson, 75 Fed.Appx. 295, 296 (5th Cir. 2003) (remedies are effectively unavailable where prison officials refuse to give inmate grievance forms upon request); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (a remedy is not available within the meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); Dotson v. Allen, No. CIV A CV606-065, 2006 WL 2945967 (S.D.Ga. Oct. 13, 2006) (dismissal for failure to exhaust not appropriate where Plaintiff argues that failure to exhaust was direct result of prison official's failure to provide him with the necessary appeal forms).

Here, plaintiff makes no suggestion that any staff member ever interfered with his filing a G-1, G-2, or G-3 to excuse his complete failure to properly initiate these two unexhausted grievances, *supra.* To the extent, therefore, that exhaustion may be waived, here, the plaintiff has failed to set forth any accepted reason, let alone any reason at all to excuse his failure to exhaust.

_____

[5] Further, he admitted that no physician ever advised him that his recurrent MRSA was caused or contributed to by any inadequate laundering procedure or that inmates such as himself who are infected with MRSA should be kept isolated from the general prison population.  (Dkt.# 97-1 at 1).

Accordingly, these two claims[6] must be dismissed for failure to exhaust and as procedurally defaulted under Woodford v. Ngo.

**B. Deliberate Indifference to Serious Medical Needs**

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d. Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[7]

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. Wilson, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence. Farmer v.

---

[6] Included within these claims recommended for dismissal are plaintiff's allegations in his amended complaint that Defendant Hoke "refused to open the third floor of the HCC medical unit," making it available for isolation of inmates with MRSA.

[7] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kan. 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F. Supp. 2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995). A detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997).

Brennan, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial of nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003)).

### 1) **Warden Hoke**

Plaintiff contends that defendant Hoke was "the backbone" of his many unresolved medical issues, in that Hoke was deliberately indifferent to plaintiff's pain and suffering throughout the pendency of the administrative grievance period for not intervening and ordering the medical staff to consider plaintiff's needs. Plaintiff alleges that Hoke knew that Wexford was not following protocol when it failed to order single-celling for MRSA-infected inmates and

proper sanitation of the laundry of MRSA-infected inmates.  Further, in his amended complaint, he implies that Hoke has permitted "hundreds of cases of staph" to occur at HCC in the past six years, and that presently there are about 30 cases; in an affidavit attached to his responses to the defendants' motions for summary judgment, he contends that the reason for the failure to address the MRSA situation at HCC is two-fold:  HCC does not want to spend the money and it does not want to report infectious disease to the proper authorities.

In order to establish personal liability against a defendant in a § 1983 action, the defendant must be personally involved in the alleged wrong(s); liability cannot be predicated solely under *respondeat superior*.  See Monell v. Department of Social Services, 436 U.S. 658 (1978); Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977).  The plaintiff does not allege any personal involvement with his medical care by Warden Hoke.  Instead, he appears to allege that Hoke is responsible for his staff and their actions.  When a supervisor is not personally involved in the alleged wrongdoing, he may be liable under § 1983 if the subordinate acted pursuant to an official policy or custom for which he is responsible, see Fisher v. Washington Metropolitan Area Transit Authority, 690 F.2d 1113 (4th Cir. 1982); Orum v. Haines, 68 F. Supp. 2d 726 (N.D. W.Va. 1999), or the following elements are established:  "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2)  the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,' and (3)  there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), cert. denied, 513 U.S. 813 (1994).

"Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury."  Id.  "A plaintiff may establish deliberate indifference by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'"  Id.

The plaintiff makes no allegations in his complaint which reveals the presence of the required elements for supervisory liability against Warden Hoke.  Further, the undersigned notes that the Fourth Circuit has held that non-medical personal may rely on the opinion of medical staff regarding the proper treatment of inmates.  Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990).  Thus, Warden Hoke could rely on the decision by Wexford's medical staff to provide appropriate medical care to the plaintiff, including making the decisions to treat the plaintiff with antibiotics other than Vancomycin, not isolate him from the general inmate population, and permit his laundry to be washed in accordance with its policies.  Consequently, the undersigned finds that the plaintiff has failed to state a claim against Warden Hoke,[8] and he should be dismissed as a defendant in this action.[9]

**2) Wexford Medical Sources, Inc.**

Plaintiff contends that Wexford's treatment of his recurrent MRSA infection was inadequate; Wexford gave him the wrong antibiotic; and that Wexford never ordered the

---

[8] To the extent that the plaintiff may be asserting that Warden Hoke was deliberately indifferent to his needs by denying the administrative grievances he filed regarding his medical care, that claim is without merit because that is not the type of personal involvement required to state a claim.  See Paige v. Kuprec, No. Civ.A. AW-02-3430, 2003 W.L. 23274357, at *1 (D. Md. Mar.31, 2003).

[9] Plaintiff's unsubstantiated allegations that HCC refuses to address the MRSA situation at the facility for monetary reasons and because it does not want to report infectious disease to the proper authorities will not be given a response. Plaintiff has provided no authority for his baseless claims and they appear to be without merit.

decolonization[10] process that would have fully and finally cured him of MRSA and prevented it from continually recurring. Further, he alleges that Wexford's medical staff's actions in sending him back to the general prison population after each MRSA recurrence, instead of single-celling him; its denial of proper sanitation in the form of clean sheets, a new mattress, and providing special laundering for the clothing or bedding of MRSA-infected inmates such as himself; and its failure to ensure that its staff was trained in the proper care and procedure for treating infectious disease constitutes deliberate indifference to his serious medical needs. Because plaintiff failed to exhaust the claims regarding single-celling and laundry procedures, those claims will not be addressed.

The plaintiff's claim that defendant Wexford has deprived him of his rights raises a claim under 42 U.S.C. § 1983, which provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

---

[10] Decolonization is the elimination of MRSA carrier state through the use of infection control measures and/or antibiotics. The indications for and efficacy of decolonization vary depending on the unique circumstances surrounding a particular episode or outbreak of MRSA colonization/infection. The effectiveness of permanent decolonization seems marginal, but special circumstances may warrant an attempt. Examples of special circumstances include the following: 1) patients who are immunosuppressed and colonized, and therefore, might develop particularly serious infections, 2) patients who are more likely to spread the organisms, due to behavior (e.g. the mentally retarded), or 3) patients who have repeated infections caused by the MRSA strain that they carry. Decolonization protocols may include the use of oral/topical antibiotics. A physician should assess each situation (an infectious disease specialist may be consulted for decolonization protocol). See Guidelines for the Control of MRSA: http://www.goapic.org/MRSA.htm

Therefore, in order to state a claim under 42 U.S.C. § 1983, the plaintiff must demonstrate that a person acting under color of state law deprived him of the rights guaranteed by the Constitution or federal laws. Rendall-Baker v. Kohn, 547 U.S. 830, 838 (1982). However, it is clear that Wexford is not a "person" for purposes of 42 U.S.C. § 1983, and is not a proper defendant in this action.

A thorough review of the medical records attached to plaintiff's responses[11] to the defendants' motions for summary judgments reveals that the plaintiff has experienced at least seven or possibly eight instances of documented MRSA or treatment for the same[12] between October 30, 2006 and September 10, 2010. Because defendant Wexford's motion for summary judgment indicates that it did not begin providing medical services at HCC until May 1, 2008, responsibility for the first infection that occurred in October 2006 cannot be laid at Wexford's feet.

On June 15, 2008, plaintiff went to medical complaining of a "knot" on his left jawline area for three days; the "knot" was approximately 2 cm X 3 cm, with a small red center and no drainage. The skin around the area was hard. He was given Motrin for the discomfort, instructed to continue warm soaks, and educated on proper handwashing. He returned to medical four days later when the "knot" broke open and began draining serous drainage. A culture was apparently done but the records plaintiff provides do not include a culture report for this date. "Treatment" was started, the chart was placed for physician review, he was given Motrin, and a note was made "already on Bactrim." (Dkt.# 100-4 at 22 – 23).

---

[11] There is no indication from either the plaintiff or the defendants that the records provided by plaintiff are complete.

[12] Plaintiff's recurrent infections were not always cultured and therefore "proven" to be MRSA; however, it is clear from the records that his repeated infections were presumed to be recurrent MRSA, especially once he was cultured nasally on October 5, 2009, and identified as a 'carrier' of MRSA; despite not being cultured every time, he received treatment appropriate for MRSA infection each time.

On July 13, 2008, he returned to medical complaining of "another wound here where the other one was. It's real sore." This lesion was described as red, raised, ½" X ½", papule-like, with no drainage, next to the spot where the previous month's infection had been. Doxycycline and daily dressing changes were ordered. Plaintiff was provided with "education/instructions" and "voiced understanding." He was advised to return to the clinic as needed; his chart was placed by the phone for consultation with the facility physician. (Dkt.# 100-4 at 23).

Over ten months later, on May 21, 2009, he returned to medical, stating that "I have staph. I've had it five times. I just need some antibiotics and bandaids." He advised that he had had a reaction to "the white antibiotic" in the past, and so he was asking for "the green one." This lesion was located on the inner aspect of his left leg, near the knee, and was described as red, inflamed, "white with a black center," hard and tender to touch, but not presently draining. Plaintiff described it as "seven" on a pain scale of 1-10. He was educated on handwashing; the lesion was covered with a dressing; he was advised to keep it covered and return daily for it to be changed daily. His chart was placed aside for physician review by the registered nurse. (Dkt.# 100-4 at 24).[13]

Approximately four and a half months later, on October 5, 2009, a health service request was placed for physician review. (Dkt.# 100-4 at 26). A culture was taken of plaintiff's nostril; three days later, a final culture report showed growth of MRSA. (Dkt.# 100-4 at 27). The records do not indicate that he was symptomatic at that time or that he received any treatment. However, approximately two weeks later on October 21, 2009, the Wexford medical staff noted

---

[13] The records appear to be incomplete as there is no documentation of the outcome of the physician review or indication as to which antibiotic was ordered.

that his "wound was heeled" [sic] but that he had been "called to medical for treatment noncompliance."[14] (Dkt. # 100-4 at 26).

About a month later, on November 9, 2009, plaintiff returned to medical stating "I have staph in my nose. It's so sore I can't stand it." He complained that his nose was running and it was so painful he could not blow it. Examination revealed that his nose was "runny," very red and irritated on the outside with a red bump visible inside it. The RN noted that he was "very anxious about getting started on antibiotics." Plaintiff again reminded Wexford staff of his Bactrim allergy, advising that the last time, he took Cipro. He requested antibiotics that he could 'keep on person;" his chart was set aside for physician review. (Dkt.# 100-4 at 26).

Approximately six weeks later, on December 28, 2009, plaintiff again returned for treatment, complaining that "I have staph in my nose." He reported that he had pulled hair out of his nose and it began to get red afterwards. He complained of pain of "seven" on a pain scale of 1-10, and also reported pressure and swelling. He reminded Wexford staff of his Bactrim allergy. He was diagnosed with "infection," prescribed Doxycycline and Rifampin. (Dkt.# 100-4 at 28).

A little over eight months later, on September 5, 2010, plaintiff again sought treatment from medical, this time for a reddened area under his right arm that was described by the RN as a "hardened spot which is tender to touch" but which was not yet draining. He was given medication for pain and fever and the physician was called; an order for Doxycycline was received after plaintiff refused the Bactrim DS that was originally ordered in error. (Dkt.# 100-4 at 16). Plaintiff returned for a dressing change and refills on his antibiotics and Motrin on September 13, 2010. The RN noted that he still had some serous drainage from the wound.

---

[14] The record does not specify what treatment plaintiff was not compliant with; his medical records indicate that he was also receiving medical treatment for several other chronic conditions besides MRSA.

(Dkt.# 100-4 at 16). Two days later, on September 15, 2010, he returned, complaining "I got staph again." His right armpit was inflamed but there was no drainage. The nurse noted it was "40% better." Plaintiff was educated on the chronic nature of recurrent MRSA and hygiene. (Dkt.# 100-4 at 25).

Accordingly, the record before the Court does not support the plaintiff's allegations of Wexford's deliberate indifference to his MRSA infection. As the foregoing summary of the plaintiff's medical treatment at HCC demonstrates, the plaintiff was repeatedly seen by the medical staff there on numerous occasions. Each time he complained of pain or symptoms of infection, he was prescribed Motrin or Tylenol, consultation was had with the facility physician, and the appropriate antibiotics were ordered. His wounds were always dressed; he was given appropriate teaching on warm soaks to the area, proper hygiene and handwashing; and was advised to return to the clinic for daily dressing changes and monitoring. While the plaintiff may want additional culturing or a different antibiotic, that fact does not give rise to an Eighth Amendment violation. See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998) (citing Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986); Estelle 429 U.S. at 106). Furthermore, the plaintiff's complaint that he should receive a decolonization procedure to permanently rid his body of the MRSA amounts to a disagreement with the medical judgment of staff at HCC. A disagreement between an inmate and his physician as to what medical care is appropriate does not state a claim for deliberate indifference to medical needs. See Wright v. Collins, 766 F.2d 841 (4th Cir. 1985)(finding that a disagreement between an inmate and a physician over the proper medical care did not establish a claim of deliberate indifference).

In conclusion, the medical records supplied by the plaintiff demonstrate that the plaintiff has received timely and proper care for his recurrent MRSA infections. It is apparent from the

record that the frequency of his infections have decreased over time, not increased: although he had three or four recurrences of MRSA in 2009, he did not have another until September of 2010. Nothing in the record or in the plaintiff's complaint establishes any facts sufficient to support a finding that defendants Wexford or Hoke have been deliberately indifferent to his medical needs, and accordingly, the plaintiff's complaint as it relates to these defendants should be dismissed for failure to state a claim.

Moreover, as for plaintiff's contention that he has suffered permanent injury as a result of his inadequately treated recurrent MRSA infections, a thorough review of plaintiff's attached medical records reveals absolutely no evidence to support this claim. Plaintiff's records contain no mention of, let alone any complaint by the plaintiff of muscle atrophy or any other injury to his muscles, "nerve numbness, destruction of veins," or any areas on his body "where the flesh has been eaten away, leaving large flesh depressions which still give the plaintiff pain."

### 2) Medical Negligence

Plaintiff contends, *inter alia,* that defendant Wexford missed his diagnosis, provided the incorrect medical treatment, and delayed his proper treatment.

Plaintiff alleges that defendant Wexford's prescribing of antibiotics other than Vancomycin to treat his recurrent MRSA infection, as well as its failure to provide him with special decolonization treatment to eradicate his body of the MRSA that he carries within him is proof that Wexford does not meet the standard of care for treatment of recurrent MRSA infection.

To the extent that the plaintiff may be seeking to establish a medical negligence claim, he must comply with West Virginia law and establish that:

(a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the

profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3.

When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required.  Banfi v. Am. Hosp. for Rehab., 529 S.E.2d 600, 605-606 (W. Va. 2000).

Additionally, under West Virginia law, certain requirements must be met before a health care provider may be sued.  W.Va. Code §55-7B-6.  This section provides in pertinent part:

§ 55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.

(b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the rules of civil procedure.

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. <u>See</u> <u>Stanley v. United States</u>, 321 F. Supp. 2d 805, 806-807 (N.D.W.Va. 2004).[3]

With regard to the appropriate standard of care, plaintiff has completely failed to sustain his burden of proof. Plaintiff does not assert, much less establish, the standard of care for the diagnosis or treatment of MRSA. Under the circumstances of this case, plaintiff would be required to produce the medical opinion of a qualified health care provider in order to raise any genuine issue of material fact with respect to the defendant Wexford's breach of the duty of care. Moreover, there is nothing in the complaint which reveals that the plaintiff has met the requirements of W.Va. Code §55-7B-6. Accordingly, even if this court has supplemental jurisdiction over the plaintiff's potential state law claims for medical malpractice, summary dismissal is appropriate.

## V.   Recommendation

For the reasons stated, the undersigned recommends that Warden Hoke's Motion for Summary Judgment (Dkt.# 96) and Wexford's Motion for Summary Judgment (Dkt.# 93) be **GRANTED**, and that the plaintiff's complaint (Dkt.# 1) and amended complaint (Dkt.# 14) be **DISMISSED with prejudice** for failure to state a claim upon which relief can be granted.

Within **fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal**

---

[3] In <u>Stanley</u>, the plaintiff brought suit against the United States alleging that the United States, acting through its employee healthcare providers, was negligent and deviated from the "standards of medical care" causing him injury.

**from a judgment of this Court based upon such recommendation**.  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985);  United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to counsel of record via electronic means.

**DATED**: December 14, 2011

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE